UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LAURA E. REICHHART,

                    Plaintiff,            No. 08-CV-6042 CJS(P)

   -vs-

                                          DECISION AND ORDER

THE UNITED STATES OF AMERICA,

                    Defendant.

_____


APPEARANCES

For Plaintiff:              John T. Refermat, Esq.
                            Peter T. Rodgers, Esq.
                            Lacy Katzen LLP
                            130 East Main Street
                            The Granite Building
                            Rochester, New York 14614

For Defendants:           Kathleen M. Mehltretter
                            Acting United States Attorney
                            Western District of New York
                            by John J. Field, Esq.
                            Assistant United States Attorney
                            620 Federal Building, 100 State Street
                            Rochester, New York 14614


INTRODUCTION

      This is a tort action against the United States brought pursuant to 28 U.S.C. §

1346(b)(1). Now before the Court is Defendants' motion (Docket No. [#16][#18]) to

dismiss for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1). For

the reasons that follow, the application is granted and this action is dismissed.

BACKGROUND

This action arises from a slip-and-fall injury on the West Pier of Rochester Harbor in Rochester, New York, known as the Charlotte Pier ("the Pier"). The Pier is owned by the United States and is maintained by the U.S. Army Corps of Engineers ("the Corps"). The Corps. has granted a license to the County of Monroe, State of New York, to use the Pier for public recreation. On July 1, 2005, Laura Reichart ("Plaintiff") was walking on the Pier, when she tripped on a hole in the concrete surface, fell, and fractured her arm. According to Plaintiff, the hole was "17 inches across, 36 inches wide and 3 inches deep." (Complaint ¶ 7). The Corps knew that the Pier's surface was in need of repair. Raymond N. Lewis ("Lewis"), Chief of the Corps.' Operations and Maintenance Office for the region, states:

> The west pier of Rochester Harbor was inspected during the 2000-2005 period of time by walking on it and identifying problems with the structural stability of the pier, such as lifting or separating. As a result of our inspections, I was aware of the condition of the pier. In addition, the Corps received periodic communications from third-parties about the pier and its [poor surface] condition. . . . Our inspections showed that substantial surface areas of the concrete cap had deteriorated over the years as the result of waves crashing onto the pier, coupled with freeze-thaw cycles.

(Lewis Affidavit, Docket No. [#16-2] at ¶ 17, 19). Lewis further states that the Corps. decided not to seek funding to repair the Pier's surface, since Rochester Harbor is a low priority harbor for the Corps.:

> Although I was aware of the condition of the pier surface, I decided not to request funds to resurface the concrete cap on the piers. I made this decision because the deteriorated surfaces did not negatively impact the authorized purpose of Rochester Harbor as a commercial harbor, and because Rochester Harbor was not a project with high priority within the [Corps'] Buffalo District. In my judgment, and to my knowledge[, and in] the judgment of my colleagues and supervisors, our operations and maintenance resources were more appropriately devoted to work on other

2

projects given higher priority, and to performing other, more critical work at Rochester Harbor, such as dredging the commercial navigation channels.

(*Id*. at ¶ 20).  As for cost, Lewis estimated that it would cost over one million dollars to repair the surface of the Pier. (*Id*. at ¶ 21).  Lewis considered posting warning signs at the Pier, but decided against it:

> I determined that posting warning signs at the west pier was unwarranted for a variety of reasons.  First, I did not think they were necessary considering the negligible safety risks.[1]  Second, I did not think they would be very helpful in any event because any potentially unsafe conditions were open and obvious; there were and are no hidden dangers to my knowledge.  Third, I was concerned that any signs we posted would be stolen and/or defaced.  I believed that if the Corps decided to post warning signs, the Corps would be bound to continually inspect and replace stolen/defaced signs, and expense and obligation that was unjustified in my judgment.

(*Id*. at ¶ 25).  Lewis further decided that there was no need to close the pier to pedestrian traffic: "Since I did not consider the west pier to be dangerous, I did not ever seriously consider the possibility of closing the pier to the public.  I believe that closing the pier would be politically very unpopular, and in my judgment, completely unwarranted." (*Id*. at ¶ 24).  Finally, Lewis states that he is not "aware of any law, regulation or policy that binds the Corps to take a specific action with respect to public safety at the west pier of Rochester Harbor," and maintains that "Corps activity and inactivity with respect to inspections, maintenance and public safety at Rochester Harbor, including the west pier, is a matter of discretion." (*Id*. at ¶ 26).

Certain federal regulations address the Corps's operation and maintenance of the Pier.  Engineering Regulation ("ER") 1130-2-520, Chapter 3, entitled "Protection of

---

[1]Lewis considered the risk to be negligible because he was aware of only one injury resulting from a fall at the Pier. (Lewis Dep. at ¶ 23).

Public Health and Safety at Jetties, Groins, and Breakwaters," Section 3-2, states, in

relevant part:

> District Commanders shall operate and maintain jetties, groins, and breakwaters for their functions as navigation aids and shoreline protection structures in a manner that does not enhance or encourage recreational or other public use unless a non-Federal entity has sponsored recreation. Specific guidance on development and execution of Project Cooperation Agreements is provided in ER 1130-2-500.

> Where local interests do not choose to cost-share in recreation facilities at navigation projects, district commanders shall be authorized to provide 'minimum facilities for public health and safety . . . . *District commanders shall be responsible for determining minimum facilities for public health and safety, such as guardrails, barricades, fencing, and warning signs . . . as required for public safety. Where negligible safety hazards exist or public access is not readily provided, facilities may not be required.*

(Field Affidavit, Docket No. [#16-5], Exhibit 8) (emphasis added). Engineering Pamphlet

("EP") No. 1130-2-520, entitled "Navigations and Dredging Operations and Maintenance

Guidance Procedures," Sections 3-3, 3-4, and 3-6, further provides:

3-3. <u>Background</u>.

a. [The Corps] currently operates and maintains 667 jetties, groins, and breakwaters in the coastal and Great Lakes regions of the United States. Approximately one-half (318) of these . . . structures are used by the public for recreation. This pamphlet will provide national consistency in the procedure for determining needs for public health and safety at all [Corps] jetties, groins, and breakwaters.

b. The physical nature and setting of jetties, groins, and breakwaters makes them inherently dangerous for general public use and at the same time, attractive to fishermen and recreationists.

3-4. <u>Guidance</u>. *Three alternatives are provided to meet health and safety needs at [Corps] maintained jetties, groins, and breakwaters. [Commanders] shall determine which alternative or combination of alternatives to select based upon site specific rationale.*

a. *No action.* This 'do nothing' alternative provides the lower end of a

range of options, and may be appropriate for instances where negligible safety hazards exist or public access is not readily provided.

b. *Post warning signs*. Under this alternative, warning signs would be posted, regularly inspected, and replaced as often as necessary to inform and alert the public of hazardous conditions related to the jetty, groin, or breakwater. All signing will be in accordance with the Signs Standards Manual, EP 310-1-6a and b. This alternative provides safety warning for public visitors while not encouraging public use of these structures.

c. *Deny entry or access*. This alternative requires installation of a fence, barricade, or other suitable construction that precludes entry or access onto jetties, groins, and breakwaters. Before entry or access is closed to the public, consideration should be given to the extent of public use and determination of potential hazards. Such an option, on an individual basis, may be necessary in dealing with a particularly dangerous jetty, groin, or breakwater.

3-6. <u>Program Implementation</u>. [Commanders] will analyze and select one or more of the above alternatives to provide health and safety at [Corps] jetties, groins and breakwaters. *In determining the appropriate management, [Commanders] should consider visitation, health and safety problems including preparing an Activity Hazards Analysis, state and local laws and regulations, participation of local authorities, Federal liability with and without facilities, and the general public safety. [Commanders] shall complete a Hazard Analysis of all jetties, groins, and breakwaters. This analysis should be reviewed periodically to determine the relative degree of hazard at each structure and the need for increased emphasis of public health and safety.* Costs for health and safety will be allocated to project purposes and shared with project sponsors on the same basis as those purposes. Costs for the alternatives can be programmed using O&M, General Funds or FC, MR&T, Maintenance funds as appropriate through normal budgeting procedures. However, at structures for which local cooperation agreements or contracts for cost sharing have been consummated, or were not required, non-Federal sponsors may be asked to provide or participate in the signing, fencing, etc., but cannot be required to do so.

(Field Affidavit, Docket No. [#16-5], Exhibit 9) (emphasis added).

On January 29, 2008, Plaintiff commenced the subject action, alleging that her

injury was caused by Defendant's negligence in failing to inspect, maintain and repair

the Pier, and in failing to warn of the dangerous condition. Plaintiff further maintains that

the Corps. violated the New York State Property Maintenance Code by failing to repair and maintain the Pier surface.

On January 13, 2009, Defendant filed the subject motion to dismiss for lack of subject-matter jurisdiction, based on the "discretionary function exception" of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).  In response, Plaintiff maintains that Defendant's decision not to repair the Pier's surface was neither discretionary nor based on policy.

ANALYSIS

*Motion to Dismiss Pursuant to Rule 12(b)(1)*

The standard to be applied on a motion to dismiss for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) is well settled:

> A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.  In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court, as it did here, may refer to evidence outside the pleadings.  A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.

*Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000) (Citations omitted).

Plaintiff brought this action pursuant to 28 U.S.C. § 1346(b)(1), which states, in relevant part, that

> the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The "discretionary function exception" of the FTCA[2] states, in relevant part:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  The discretionary function exception "is "a form of retained sovereign immunity.  As a result, the [FTCA's] waiver of federal sovereign immunity does not encompass actions based upon the performance of, of failure to perform, discretionary functions." *In re World Trade Center Disaster Site Litigation*, 521 F.3d 169, 190 (2d Cir. 2008).  The discretionary function exception applies

> only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis.

*Coulthurst v. U.S.*, 214 F.3d 106, 109 (2d Cir. 2000) (citations omitted).  The term "considerations of public policy" refers to "considered judgment[s] grounded in social, economic, and political policy." *Id*. at 111 (citation and internal quotation marks omitted).

Significantly, for purposes of this case, in making such policy decisions, the Government is permitted to weigh safety factors against other factors, such as cost:

> [Plaintiffs] contend that there is a safety exception to the discretionary

---

[2]"Under traditional principles of sovereign immunity, the United States is immune from suit except to the extent the government has waived its immunity. In 1946, Congress adopted the FTCA which, subject to numerous exceptions, waives the sovereign immunity of the federal government for claims based on the negligence of its employees." *Coulthurst v. U.S.*, 214 F.3d 106, 108 (2d Cir. 2000) (citation omitted).

function doctrine.  Thus, they aver, first, that a failure to warn does not fall within the discretionary function exception, and, second, that the Government must take 'reasonable steps' to minimize the risk of personal injury.  However, there is no generalized safety exception to the discretionary function doctrine. . . . [Here,] there are identifiable policy concerns, including safety on the one hand as compared with aesthetics and historical accuracy on the other, which the NPS is given the discretion to weigh in making a decision such as how much and what kind of lighting to provide within the Statue of Liberty Monument.

*Brotman v. United States*, 111 F.Supp.2d 418, 426-27 (S.D.N.Y. 2000) (citations omitted).

On the other hand, the discretionary function exception will not apply where the Government fails to take discretionary safety measures for reasons unrelated to policy. For example, in *Andrulonis v. U.S.*, 952 F.2d 652 (2d Cir. 1991), a scientist employed by the U.S. Center for Disease Control ("CDC") failed to warn a fellow scientist about the dangers involved in experimenting with a rabies virus.  The Second Circuit held that the discretionary function exception did not apply, since the failure to warn did not involve policy considerations:

[I]t is hardly conceivable that the CDC would ever have a policy to keep silent about obvious, easily-correctable dangers in experiments using drugs supplied by the CDC. Although we recognize that Dr. Baer is a distinguished, high-level official with substantial discretionary authority to shape policy at the CDC, we do not agree that his negligent omission in this case could implicate any policy considerations and thereby warrant protection under the discretionary function exception.

*Id*. at 655.

Congress has given the Corps. certain duties and powers to make improvements to harbors.  In that regard, 33 U.S.C. § 541 states, in relevant part, that

in the consideration of such works and projects the board shall have in view the amount and character of commerce existing or reasonably prospective which will be benefited by the improvement, and the relation of the ultimate cost of such work, both as to cost of construction and maintenance, to the public commercial interests involved, and the public necessity for the work

and propriety of its construction, continuance, or maintenance at the
expense of the United States.

In discussing this statute, the Ninth Circuit observed

that the Corps is required by this statute to make a judgment balancing
these sometimes conflicting considerations: (1) how much commerce
benefits from the project; (2) what kind of commerce; (3) how much the
project will cost; (4) how necessary is the work; (5) should the work be built,
continued or maintained by the federal government, or some other entity.

*National Union Fire Ins. v. U.S.*, 115 F.3d 1415, 1419 (9th Cir. 1997), *cert den.* 522 U.S.

1116, 118 S.Ct. 1053 (1998).

Applying these applicable principles of law, the Court finds, first, that the Corps.'s

challenged acts were discretionary, and were not compelled by statute or regulation.  In

that regard, EP No. 1130-2-520 provides Corps. Commanders with three options for

maintaining safety, including the option of "doing nothing" where "negligible safety hazards

exist."  In this case, the Corps. chose the "do nothing" option, based on Lewis's

discretionary determination that the Pier posed a negligible safety hazard.

Plaintiff contends that Defendants' reliance on EP 1130-2-520 is misplaced, since

the Corps. "does not even claim that it complied with [the policy]," and since Lewis

"testified at his deposition that he was unaware whether the Corps had a policy or practice

to address complaints or concerns about the Pier's condition." (Plaintiff's Memo of Law at

4) (citing Lewis Deposition at pp. 60-61).  Plaintiff is correct that Lewis' affidavit in support

of dismissal does not specifically refer to EP 1130-2-520, or to any regulation.

Nevertheless, the Court finds that point irrelevant, since Lewis' affidavit, in which he

explains his decision-making process, indicates that he considered the very factors that

are contained in EP 1130-2-520.  Moreover, the Corps. is not required to show that it

relied on a particular regulation in making its decision, but rather, it is required to show that its decision was discretionary, and was not compelled by statute or regulation. Neither does Lewis' deposition testimony indicate that he was unaware of EP 1130-2-520. Instead, in the deposition testimony cited by Plaintiff, Lewis was asked if the Corps. had "a policy or a practice if it becomes aware of complaints or concerns about the condition of the pier." (Lewis Dep. at 60). Lewis correctly understood the question as asking whether he was aware of a specific policy for responding to "complaints or concerns" about the Pier from the public, to which he answered in the negative. (*Id*. at 60-62). However, EP 1130-2-520 does not establish a policy for responding to complaints, but instead, it deals with safety generally. Consequently, the cited portion of Lewis' testimony does not indicate that he was unaware of EP 1130-2-520.

Plaintiff also argues that the Corps. failed to comply with EP No. 1130-2-520, because in making his decision, Lewis did not prepare an "Activity Hazards Analysis," as referred to in section 3-6 of the EP, set forth above. Plaintiff is correct that the EP states that Commanders "shall complete a Hazard Analysis of all [Corps] jetties, groins, and breakwaters." Plaintiff is also correct that, at the present time, the Corps. "has made no showing that it prepared an Activity Hazards Analysis," although, really, there is no proof either way on this point. However, even assuming that the Corps. never completed such an analysis, such fact does not change the discretionary nature of the decision at issue, that is, the decision not to repair/maintain or to post a warning sign.

Plaintiff's contention regarding the Activity Hazards Analysis is, really, that the Corps. failed to follow the proper procedure in exercising its discretion. Such failure might at least be relevant if the challenged decision resulted from a lack of knowledge

10

concerning the Pier's condition. Here, however, Defendant was clearly aware of the deteriorated condition of the Pier's surface. Therefore, even if Defendant did not technically comply with the requirement of preparing an Activity Hazards Analysis, there is no reason to believe that the challenged decision would have been any different if Defendant had done so. In sum, Defendant's challenged conduct was discretionary, even if that discretion was not exercised in strict compliance with EP No. 1130-2-520. *See, In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 210, 215 (2d Cir. 1987) ("[W]here, as here, the Government is performing a discretionary function, the fact that discretion is exercised in a negligent manner does not make the discretionary function exception inapplicable.") (citations omitted).

Second, the Court finds that the judgments resulting in the complained-of actions or omissions are grounded in considerations of public policy or are susceptible to policy analysis. Moreover, the record indicates that, in making the complained-of decisions, Lewis actually weighed various policy considerations, including the purpose of the Pier, the cost to repair the Pier, and public safety. For example, Lewis considered that Rochester Harbor is a commercial harbor, and that the deterioration of the Pier's surface did not affect the structural integrity of the Pier. Lewis further considered that Rochester Harbor is a low-priority harbor for the Corps., and that the cost to repair the Pier surface would exceed one million dollars. Lewis also considered safety, and decided that the Pier, while deteriorated, was not dangerous, since the defects were open and obvious.

Plaintiff responds that "the dangerous conditions at Rochester Harbor were not the product of purposeful policy making, but rather [were the product of] of negligent neglect." (Pl. Memo of Law at 9). However, Plaintiff offers no evidence to support that view.

11

Plaintiff also cites certain reported decisions, including *Wright v. U.S.*, 866 F.Supp. 804 (S.D.N.Y. 1994) and *Lanzilotta v. U.S.*, No. 95-CV-5334 (JG), 1998 WL 765143 at *5 n.2 (E.D.N.Y. Jan. 5,1998), but those cases are factually inapposite.

CONCLUSION

For the foregoing reasons, Defendants' motion [#16][#18] is granted, and this action is dismissed.

SO ORDERED.

Dated: Rochester, New York
February 22, 2010

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge